United States District Court
Southern District of Texas
**ENTERED**
September 10, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| HIDALGO COUNTY IRRIGATION DISTRICT NO. 2 | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIV. NO. 7:26-CV-00368 |
| | § | |
| SPENCER CONSTRUCTION, LLC, ROYAL CONCRETE PRODUCTS, LLC, UNITED STATES OF AMERICA | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION

Pending before the Court is Plaintiff's, Hidalgo County Irrigation District No. 2 (the "Irrigation District"), request for a preliminary injunction (Dkt. No. 3). The undersigned held a hearing on the matter on August 26, 2026.[1] The Irrigation District contends Defendants Spencer Construction, LLC ("Spencer"), Royal Concrete Products, LLC ("Royal Concrete"), and the United States unlawfully entered onto the Irrigation District's property and began constructing the border wall. The Irrigation District is asking this Court to enjoin Defendants' actions to prevent any further injury. (Dkt. No. 3 at 4–6). The United States filed a motion to dismiss (Dkt. No. 9) as part of these proceedings which remains pending before the Court.

After careful review of the record, relevant caselaw, and evidence presented at the hearing, the undersigned recommends Irrigation District's request for a preliminary injunction (Dkt. No. 3) be **GRANTED.**

---

[1] This matter has been referred to the undersigned magistrate judge for a report and recommendation pursuant to 18 U.S.C. § 636(b)(1)(B) and LR 72 in regard to the request for preliminary injunction and expedited hearing.

## I. Background

This case presents a classic battle of opposing interests: a local county's interests in preserving its property, and the nation's interest in protecting and securing the border.

This dispute arises out of a trespass on the Irrigation District's property. The Irrigation District is a government entity operating in Hidalgo County. It provides water to a large customer base. Spencer and the United States government entered into a contract to build a portion of the border wall along the Irrigation District's water canal. Spencer entered the property with Royal Concrete, prepped the site for construction, and began the process of constructing the wall[2] soon thereafter. No one contacted the Irrigation District to inform it of the construction plans. In fact, the Irrigation District discovered construction on its property through its own observations. Out of fear of damage to the canal, potential choking of the water supply, and dispute over property ownership, the Irrigation District initially asked a state district judge to enjoin the United States from further construction until the aforementioned issues were resolved.

### a. Procedural Background

On July 30, 2026, the Irrigation District filed its Original Petition (Dkt. No. 1-1) in the 476th Judicial District Court, Hidalgo County, Texas. The Honorable State District Judge Nereida Lopez-Singleterry granted the Irrigation District's request for a temporary restraining order (TRO) on the same day. (*Id.* at 79–81). The state district court also scheduled a hearing to occur on August 13, 2026. (*Id.* at 81). On August 5, 2026, Spencer filed a Plea to the Jurisdiction, Improper Party Named, Answer and Counterclaim. (*Id.* at 94–96). Spencer then filed an Emergency Motion to Dissolve the TRO (Dkt. No. 1-1 at 99–101) the next day.

---

[2] The Court will refer to the "wall" throughout this report and recommendation. The "wall" is what is colloquially understood as the "border wall."

On August 12, 2026, the United States removed this case to the Southern District of Texas, McAllen Division, pursuant to 28 U.S.C. §§ 1441, 1442, 1446. (Dkt. No. 1). The Irrigation District filed an Emergency Motion for Continuance of the TRO the same day. (Dkt. No. 3). The Honorable District Court Judge Arthur R. Jones granted the Irrigation District's motion and extended the TRO through August 27, 2026. (Dkt. No. 4).

On August 14, 2026, the United States filed an unopposed motion to continue the preliminary injunction hearing and extend the TRO. (Dkt. No. 5). On August 17, 2026, the case was called for a status conference and the continuance for hearing was granted and rescheduled for August 26, 2026.

On August 24, 2026, Defendant Royal Concrete filed its answer. (Dkt. No. 7). The next day, the Irrigation District filed its answer (Dkt. No. 8) to Spencer's counterclaim (Dkt. No. 1-1 at 94–96). The United States filed a Motion to Dismiss (Dkt. No. 9) on August 25, 2026. The undersigned then held the hearing on the preliminary injunction on August 26, 2026. After the hearing, the Irrigation District filed a second Motion to Continue and Extend the TRO (Dkt. No. 12) through September 10, 2026; that was granted by the undersigned on the same day. (Dkt. No. 13). On August 28, 2026, the Honorable Judge Jones granted the TRO upon consideration of United States's Opposed Emergency Motion contesting the order issued on August 26, 2026. (Dkt. Nos. 15, 17). Additionally, the Irrigation District filed its response (Dkt. No. 16) to the Government's Motion to Dismiss and Spencer filed a brief (Dkt. No. 14) addressing the Irrigation District's governmental immunity claims. The United States then filed a Reply in Support of Motion to Dismiss on August 31, 2026. (Dkt. No. 18).

**b. Parties' Arguments**

The Irrigation District's Original Petition (Dkt. No. 1-1) requested injunctive relief in the form of a TRO and stated claims against Spencer and Royal Concrete for trespass. (Dkt. No. 1-1 at 9–14). The Irrigation District argued that Spencer and Royal Concrete were engaged in construction on its own property without permission. (*Id.* at 8, ¶ 9). It asked for injunctive relief on the basis that it will suffer irreparable harm and has no adequate remedy at law for Spencer's and Royal Concrete's actions. (*Id.* at 10–12, ¶¶ 20–26). It further asked for a preliminary injunction and a permanent injunction arguing the same. (*Id.* at 14–15, ¶¶ 34–35). Spencer responded on August 5, 2026, arguing that the District Court's jurisdiction was improper because Spencer was engaged in a contract to build the border wall with the United States. (*Id.* at 94–95). Accordingly, Spencer argues the United States is the proper defendant, and counterclaims arguing the Irrigation District has caused Spencer to suffer losses in the amount of $50,000 per day because of an unlawfully obtained TRO. (*Id.* at 94, 96). Spencer then filed an Emergency Motion to Dissolve the TRO arguing the same. (*Id.* at 99–101).

The Irrigation District then filed an Emergency Motion for Continuance of the TRO (Dkt. No. 3) upon removal of case to federal court, addressing the same arguments made to the state district judge. Defendant Royal Concrete, in its answer, argues the Irrigation District cannot prevail on the requirements for an injunction, and maintains it has no knowledge of the Irrigation District's ownership of the property, nor any substantial dirt or damage affecting the canal. (Dkt. No. 7 at 1–2, ¶¶ 4–10). The Irrigation District filed its own answer and argued that the TRO was obtained lawfully, Spencer is not suffering any damages as it is currently working elsewhere, and that Spencer will not be damaged from injunctive relief. (Dkt. No. 8 at 1, ¶¶ 1–3).

The United States filed its Motion to Dismiss (Dkt. No. 9) arguing the United States owned the disputed land, and even if not, the trespass claim has no merit under the government's eminent domain powers and Fifth Circuit precedent. (Dkt. No. 9 at 2–5). The Irrigation District filed its response to the United States (Dkt. No. 16) and argued the United States never properly intervened in the lawsuit, Fifth Circuit precedent has allowed a trespass claim against the federal government, the United States did not follow 42 U.S.C. § 4651 when attempting to take the Irrigation District's land, and in the alternative, the Irrigation District should be given a chance to cure any deficiencies in the pleadings. (Dkt. No. 16 at 3-8, ¶¶ 5-13). The United States filed its Reply in Support of its Motion to Dismiss. (Dkt. No. 18). It argued that the United States is indeed a proper defendant, it has the authority to build the border wall, it acquired the disputed land through inverse condemnation, 42 U.S.C. § 4651 creates no rights, and the Irrigation District should not be able to cure its request for injunctive relief. (Dkt. No. 18 at 1–4).

**c. Hearing Testimony**[3]

The Louisiana Rio Grand Canal Company (the "Canal Company") was formed around 1910 for the purpose of supplying water for nearby farming and agriculture. (Injunction Hr'g Tr. 9:13:59–9:14:31 AM). The Canal Company conveyed all property to Hidalgo County Improvement District (the "Improvement District"). (*Id.* at 9:15:40–9:16:13 AM; Dkt. No. 10-3 (Pl. Ex. 3)). The Irrigation District then took over operations from the Improvement District. (*Id.* at 9:16:40–9:17:11 AM). As a result, the Irrigation District now owns all the rights associated with the Canal Company since 1910. (*Id.* at 9:17:10–9:17:23 AM). The Irrigation District operates, serves, and oversees about 65,000 acres. (*Id.* at 9:17:47–9:18:00 AM). The Irrigation District

[3] These facts are based on the testimony and evidence presented at hearing conducted on August 26, 2026. At the hearing, Mr. Anthony Stambaugh, General Manager for Hidalgo County Irrigation District No. 2, testified on behalf of the Irrigation District; Mr. Patrick Spencer, principal owner of Spencer Construction, testified for Spencer Construction. (Injunction Hr'g Tr. 9:12:04–9:12:24 AM; 10:40:31—10:40:50 AM).

services farmers, agriculture related activities, and is the sole source of water for various cities including Pharr, San Juan, and Alamo. (Injunction Hr'g Tr. 9:18:00–9:18:33 AM). It also supplies water to North Alamo Water Supply Corporation and parts of cities of McAllen and Edinburg. (*Id.* at 9:18:33–9:18:40 AM). The Irrigation District pumps water from the Rio Grande into a reservoir, then feeds it through its "network" which is made up of a series of canals and pipelines to distribute the water. (*Id.* at 9:19:00–9:19:23 AM). The reservoir itself holds around 1,800 acre feet of water. (*Id.* at 9:19:28–9:19:35 AM).

Notably, the Irrigation District's ownership can be traced back to a handwritten deed from 1911. (*Id.* at 9:56:43–9:57:21 AM; Dkt. No. 10-1 (Pl. Ex. 1)). It demonstrates a conveyance to the Canal Company. (Injunction Hr'g Tr. 9:57:21–9:57:43 AM; Dkt. No. 10-1 (Pl. Ex. 1)). The Canal Company then reconveyed the land to the previous owner but reserved its rights in the land it planned to construct an irrigation system. (*Id.* at 9:58:30–9:59:13 AM; Dkt. No. 10-2 at 4, ¶ 9 (Pl. Ex. 2)). Next, there is a 1920 deed demonstrating a conveyance from the Canal Company to the Improvement District. (*Id.* at 10:00:20–10:00:34 AM; Dkt. No. 10-3 (Pl. Ex. 3)). The Irrigation District took over the responsibilities, rights, and obligations of the Improvement District around 1980 and has maintained Lateral A ever since. (*Id.* at 10:01:30–10:01:43 AM).

The canal in dispute here is Lateral A.[4] (*Id.* at 9:20:16–9:20:31 AM). It is the southernmost lateral in the Irrigation District's system. (Injunction Hr'g Tr. 9:20:31–9:20:37 AM). This specific lateral does not receive water from any other canal, but rather directly from the reservoir. (*Id.* at 9:21:00–9:21:11 AM; Dkt. No. 10-17 at 2 (Pl. Ex. 17, second photograph)). Lateral A is about seven miles long. (*Id.* at 9:23:00–9:23:08). It runs east for about five miles

---

[4] The Court may refer to the location at issue as both "canal" and "lateral" throughout. Both refer to Lateral A as described.

before reaching the Santa Ana Wildlife Refuge,[5] then proceeds east for another two miles. (*Id.* at 9:23:22–9:23:42 AM). About a couple thousand feet of wall is scheduled to be constructed on this portion adjacent to the Refuge, while most of the 2.8 miles in dispute are to be built alongside Lateral A. (*Id.* at 11:01:22–11:01:45 AM). Because of Lateral A's location, it requires a substantial amount of room to effectuate repairs. (Injunction Hr'g Tr. 9:22:20–9:22:31 AM; Dkt. No. 10-17 (Pl. Ex. 17, three photographs of maintenance work at Lateral A)). Specifically, the Irrigation District needs around sixty feet on either side of the canal for repairs. (*Id.* at 9:22:33–9:22:44 AM). This is especially true when the Irrigation District needs to use an excavator to remove excess hydrilla.[6] (*Id.* at 9:26:20–9:27:23 AM; Dkt. No. 11-4 (Spencer Ex. 4) (photograph of hydrilla within canal)). Lateral A alone serves about 8,000 acres of land. (*Id.* at 9:23:49–9:24:00 AM).

Records indicate that Lateral A has existed since 1909. (*Id.* at 9:24:16–9:24:29 AM). Lateral A undergoes routine maintenance such as mowing every two to three months, and repairs—like addressing the hydrilla—on an as needed basis. (*Id.* at 9:24:37–9:25:16 AM). Other repairs include the need for excavators, backhoes, materials to isolate the gate and prevent water from coming into the canal, the use of crew trucks, and concrete trucks to reline the canal. (Injunction Hr'g Tr. 9:28:57–9:29:35 AM; Dkt. No. 10-17 at 3 (Pl. Ex. 17, third photograph)).

---

[5] The Santa Ana National Wildlife Refuge is owned by the United States. The Parties do not dispute this point. *See also Lower Rio Grande Valley National Wildlife Refuge*, U.S. FISH AND WILDLIFE SERV., DEP'T OF INTERIOR, https://www.fws.gov/refuge/lower-rio-grande-valley (last visited Sept. 5, 2026) (noting that the Lower Rio Grande Valley Wildlife Refuge, which includes both the Laguna Atascosa and Santa Ana National Wildlife Refuges, "was established ' . . . for the development, advancement, management, conservation, and protection of fish and wildlife resources . . . ' 16 U.S.C. § 742f(a)(4); ' . . . for the benefit of the United States Fish and Wildlife Service, in performing its activities and services'.").

[6] Hydrilla is an invasive aquatic plant species that disrupts the water flow in canals and laterals. (Injunction Hr'g Tr. 9:26:30–9:26:50 AM).

The Irrigation District first became aware of another party entering their land upon discovering wattles[7] on the property on July 1, 2026. (*Id.* at 9:30:27–9:30:43 AM, 9:32:17–9:32:22 AM). Importantly, no one, including the named parties in this lawsuit, informed the Irrigation District that any work would be performed on the property, let alone to place wattles by the lateral. (*Id.* at 9:31:00–9:31:37 AM). The Irrigation District immediately contacted the contractor—Spencer—and instructed them to remove the wattles. (*Id.* at 9:32:36–9:32:52 AM). The wattles, however, were not removed, so the Irrigation District removed them to allow for the routine mowing to take place. (*Id.* at 9:32:52–9:33:05 AM). Construction started on July 13, 2026. (Injunction Hr'g Tr. 10:41:06–10:41:17 AM). Spencer continued to occupy the premises and did not cease operations. (*Id.* at 9:33:35–9:33:52 AM). These continued operations included the presence of heavy equipment and a Royal Concrete truck on the Irrigation District's property. (*Id.* at 9:35:10–9:35:37 AM; Dkt. No. 10-8 (Pl. Ex. 8)). In fact, the equipment and vehicles appear to be about ten feet from the centerline of the canal, well within the sixty-foot zone subject to the Irrigation District's control. (*Id.* at 9:35:37–9:36:32 AM; Dkt. No. 10-9 (Pl. Ex. 9)). Spencer also left deposits of dirt and soil on the bank of the canal, affecting the slope. (*Id.* at 9:40:35–9:40:55 AM; Dkt. No. 10-12 (Pl. Ex. 12)). Spencer ceased operations and removed the equipment upon receiving notice of the initial TRO. (*Id.* at 10:43:23–10:43:30 AM). Spencer initially entered the premises because it maintains a contract with the United States to construct the border wall along Lateral A. Spencer is involved with significant border wall construction. (Injunction Hr'g Tr. 10:59:39–10:59:50 AM). In fact, this specific agreement is to build 2.8 miles

[7] Wattles are long cylindrical items filled with straw. (Injunction Hr'g Tr. 9:30:47–9:31:00 AM). They are placed parallel to a body of water—such as Lateral A—to prevent dirt and debris from entering the water from activity such as construction work. (*Id.*).

out of thirty-four that Spencer is currently under contract to build with the Government. (*Id.* at 11:02:28–11:03:01 AM).

On July 21, 2026, the Irrigation District sent Spencer a letter informing them to stop encroaching and trespassing on their property, as well as remove any remaining debris and equipment. (*Id.* at 9:41:17–9:41:38 AM; Dkt. No. 10-13 (Pl. Ex. 13)). The Irrigation District demonstrated its land ownership by producing a survey identifying a right-of-way of about 120 feet with Lateral A. (*Id.* at 9:45:20–9:45:52 AM; Dkt. No. 10-7 (Pl. Ex. 7)).[8] It also identifies portions where previous border wall has already been built on the Irrigation District's property. (*Id.* at 9:46:44–9:46:57 AM; Dkt. No. 10-7 (Pl. Ex. 7)). Notably, there is a portion of wall built on or around 2021 that is about sixty-one feet from the lateral, which appears to honor the Irrigation District's sixty-foot ownership on each side. (*Id.* at 9:47:33–9:48:11 AM; Dkt. No. 10-7 (Pl. Ex. 7)). Moreover, the Irrigation District had no issues maintaining Lateral A after that older portion of the border wall was constructed. (Injunction Hr'g Tr. 10:21:25–10:21:42 AM). Subsequent construction, however, has not honored this ownership as the government built more wall within forty-five feet of the centerline. (*Id.* at 9:48:10–9:48:50 AM; Dkt. No. 10-7 (Pl. Ex. 7)). There are three portions of the wall, respectively built with 45.7 feet, 53.2 feet, and 56.5 feet of the center canal line. (*Id.* at 9:48:15–9:50:01 AM; Dkt. No. 10-7 (Pl. Ex. 7)).[9]

Spencer responded that same day, July 21, and asked for a five-day extension to remove the dirt, debris, and material. (Irrigation Hr'g Tr. 9:51:06–9:51:25 AM). On July 27, the

---

[8] Mr. Stambaugh also testified to two other surveys, one from February 7, 1929, reflecting that Lateral A has a 120 feet right-of-way based on the calculating said right-of-way from the scale set forth within each survey. (Injunction Hr'g Tr. 10:02:17–10:05:54 AM; Dkt. No. 10-5 (Pl. Ex. 5 (Survey, "Feb. 7, 1929"); 10:06:01–10:07:02 AM; Dkt. No. 10-6 (Pl. Ex. 6 (Survey, undated)).

[9] There are two Pl. Ex. 7's; one is an enlarged version of the one filed on record provided for demonstrative purposes at the hearing. (See Dkt. No. 10-7 (Pl. Ex. 7)).

Irrigation District requested documentation from Spencer regarding its contract with the United States, the construction plans, and its purported ability to build on the Irrigation District's property. (*Id.* at 9:52:17–9:53:16 AM). Spencer refused to provide the Irrigation District with the plans. (*Id.* at 10:59:22–10:59:30 AM). To date, the Irrigation District has not received the requested documentation. (Injunction Hr'g Tr. 9:52:17–9:53:16 AM). The Irrigation District has not received any condemnation plans nor any requests to survey the property at issue. (*Id.* at 9:55:57–9:56:17 AM).

The Irrigation District's primary concern with the construction of the border wall is that it is on its land, it cannot comfortably maintain Lateral A with the wall and will not be able to facilitate any necessary repairs. (*Id.* at 10:11:53–10:12:37 AM). The Irrigation District stated it would have no issue if the construction was simply fifteen feet further south of the canal.[10] (*Id.* at 10:15:00–10:15:20 AM).

Spencer claims it had permission to occupy premises and begin construction pursuant to a contract with the United States Customs and Border Protection. (*Id.* at 10:41:33–10:41:51 AM). Specifically, Spencer argues it had authority to work at the location pursuant to conversations, and a "map"[11] offered by the United States government. (*Id.* at 11:08:26–11:09:10 AM). Spencer further alleges it loses out on roughly $50,000 per day[12] that it cannot construct the wall because of the TRO. (Injunction Hr'g Tr. 10:49:54–10:50:03 AM). This cost includes overhead

---

[10] Neither party presented any evidence regarding the feasibility of relocating the wall fifteen feet. On cross-examination, the representative for Spencer, Mr. Patrick Spencer, indicated there could be issues with the floodplain, utilities, and other unknown variables. (Injunction Hr'g Tr. 11:18:23–11:18:33 AM).

[11] Mr. Spencer referred to this as a "right of way clearance map" throughout his testimony. The "map" was never offered into evidence by any party, nor could Mr. Spencer discuss with specificity the bounds authorized by this "map."

[12] Mr. Spencer calculated this number because Spencer "tracks [its] costs daily," but failed to demonstrate the method behind the calculations. (Injunction Hr'g Tr. 11:22:59–11:23:17 AM).

personnel[13] (roughly forty to fifty employees on this job), equipment, and materials currently not in use. (*Id.* at 10:50:03–10:50:14 AM; Dkt. No. 11-3 (Spencer Ex. 3, photograph of equipment)). Spencer's workers remained idle from August 1, 2026, through August 18, 2026, the day Spencer received suspension from the government. (*Id.* at 11:20:27–11:20:53 AM).

**d. Findings of Fact**

The Court held a hearing pursuant to Federal Rule of Civil Procedure 65(a)(2). Based on the evidence in the record, and the evidence and testimony presented at the preliminary injunction hearing, the undersigned proposes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1):

- The Irrigation District provides water to farmers, corporation, parts of Edinburg and McAllen, and is the sole provider of water to Pharr, San Juan, and Alamo.
- The Irrigation District is in control of Lateral A.
- Lateral A has existed since 1909.
- The Irrigation District maintains ownership, pursuant to an easement, of 120 feet along the canal. This amounts to sixty feet from the centerline on each side of the canal.
- This 120-foot easement was properly recorded and designates control and ownership to the Irrigation District.
- There is no evidence presented that the right-of-way is only 100 feet as claimed by the United States.
- Defendant Spencer maintains a construction contract with the United States to build the border wall.
- Defendant Spencer maintains a contract with Royal Concrete to provide concrete for the construction of the border wall.
- Defendant Spencer trespassed onto this land when it placed wattles, equipment, and bollards on the property on July 1, 2026.
- Defendant Royal Concrete trespassed when construction began on July 13, 2026.
- Nobody from Spener or the United States contacted the Irrigation District prior to construction.

[13] When asked if the employees remained idle during the TRO, Spencer stated some of the employees were indeed working but stated they were not performing "productive" work. (Injunction Hr'g Tr. 11:20:58–11:21:10 AM). Mr. Spencer defines "productive work" as installing, building roads, generating revenue, and completing projects. (*Id.* at 11:22:17–11:22:27 AM). The employees were engaged in other work such as washing a truck and preparing the jobsite. (*Id.* at 11:21:42–11:21:58 AM).

- The Irrigation District sent, and Spencer received, a letter on July 21, 2026, from the Irrigation District demanding construction cease and stop trespassing on its property.
- Construction ceased on July 21, 2026.
- The equipment was fully removed and the trespass ceased by July 30, 2026.
- The Irrigation District requested information regarding Spencer's contract with the United States on July 27, 2026, and has yet to receive said information.
- One prior section of border wall was constructed outside of the sixty-foot window.
- Three sections of border wall have since broke ground within this sixty-foot threshold (at 45.7 feet, 53.2 feet, and 56.5 feet respectively).
- During the construction of the new border wall, Spencer left equipment and dirt and debris well within the sixty-foot window, even leaving equipment hanging over the canal.
- Spencer did not perform any construction through August 18, 2026.
- Spencer provided no evidence to corroborate the claim that Spencer Construction was losing approximately $50,000 a day to the enforcement of the TRO up to August 18, 2026.
- Spencer provided no evidence of any loss/costs after August 18, 2026.

## II. Relevant Law

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Titlemax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1975)); *see also Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting a preliminary injunction is an extraordinary remedy). The court must balance each party's claims and consider how granting the injunction will affect their interests. *Gen. Land Off. of Tex.*, 722 F. Supp. 3d 710, 737 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (S.D. Tex. 2024), *judgment entered sub nom. Gen. Land. Off. of Texas v. Biden*, No. 7:21-CV-00272, 2024 WL 2754118 (S.D. Tex. May 29, 2024), *vacated sub nom. Gen. Land. Off. of Tex. v. Trump*, No. 7:21-CV-00272, 2025 WL 305184 (S.D. Tex. Sept. 15, 2025).

> A preliminary injunction should be granted where a movant shows (1) a substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in his favor, and (4) that an injunction is in the public interest.

*Id.* at 737–38 (citing *Benisek*, 585 U.S. at 158).

The Fifth Circuit utilizes a "sliding-scale" analysis on each factor. *Titlemax of Tex., Inc.*, 142 F.4th at 328. A showing of some success on the merits and a strong showing of other factors will justify temporary relief. *Id.* (citing *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). However, if a party does not demonstrate a substantial likelihood of success on the merits, the court need not analyze the remaining three factors. *Id.* at 335.

**a. Substantial Likelihood of Success on the Merits**

This factor requires the plaintiff to demonstrate a prima facie case but need not demonstrate an entitlement to summary judgment. *Id.* at 329 (citing *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013)). In addressing a likelihood of success on the merits, courts will look to the relevant substantive law. *Id.* (citing *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011)). The substantive law here concerns the Irrigation District's interests in its own land and the application of state trespass law, and the United States' interest in further construction of the border wall for increased security. These arguments will be addressed in this element.

The Irrigation District's main argument hinges on *Texas v. United States* and 42 U.S.C. § 4651 for the proposition that the United States government can be liable for trespass on state land, and that even if it is not, the United States did not follow the requisite procedures to acquire the state's land. (Dkt. No. 16 at 4–5, 6–7, ¶¶ 8, 11–12). The United States, on the other hand, argues that the United States in fact owns the land, and even if it does not, it is entitled to capture the land through its powers of eminent domain as explained in *United States v. Bennett*. (Dkt.

No. 9 at 3). Further, in a subsequent reply, for the first time, the United States argues that it has statutory authority to build the wall pursuant to the Illegal Immigration Reform and Immigration Responsibility Act of 1997 and the One Big Beautiful Bill Act of 1995. (Dkt. No. 18 at 2–3).

As will be explained, the Irrigation District's arguments based on the noted citations will most likely not carry the day; however, while there is congressional authorization for the border wall, there is also congressional authorization on the procedures to obtain the land to build said border wall. And, on this point, the Irrigation District has a likelihood of success on the merits.[14]

i. *Irrigation District Arguments for Preliminary Injunction*

Plaintiff relies on *Texas v. United States*, 123 F.4th 186 (5th Cir. 2024), for the proposition that a state law trespass claim *can* prevent the government from intruding onto private property. This case, however, does not deal with the same issues presented at the hearing. *Texas* grapples with Texas' ability to control or redress concerns when the federal government is not acting pursuant to their operations or functions. Essentially, whether the federal government maintains sovereign immunity when not acting in its official capacity.

In this case, the State of Texas asked for an injunction against the United States Department of Homeland Security (DHS) for common law trespass and conversion for damages that DHS caused to concertina wire on Texas' state property. *Texas*, 123 F.4th at 193. The specific issue the court addressed was "whether United States Border Patrol agents can legally cut a concertina wire . . . fence the State of Texas has placed along part of the border with Mexico." *Id.* at 192. Texas laid over twenty-nine miles of wire to deter illegal immigration. *Id.* at 193. Border Patrol agents then began cutting the wire to permit illegal aliens enter the United States. *Id.* In

[14] The United States also submits that the land where the wall has been built this year actually belongs to the United States. (Dkt. No. 9 at 2–3). Yet, the United States also states that "**none of that matters**." *Id.* at 3. (emphasis in original).

performing the *Winter* four factor analysis for a preliminary injunction, the lower court determined the factors favored Texas but declined to issue an injunction on the basis the government was protected by sovereign immunity. *Id.* at 195.

The Fifth Circuit Court of Appeals, on review, analyzed the immunity defense. It determined 5 U.S.C. § 702 did not prevent Texas from suing the United States on this matter. *Id.* at 199. The court next addressed the issue of intergovernmental immunity. A state law will violate "intergovernmental immunity when it (1) regulates the United States directly or (2) discriminates against the Federal Government or those with whom it deals." *Id.* at 205 (citing *United States v. Washington*, 596 U.S. 832, 838 (2022)). It determined intergovernmental immunity did not apply "because (1) Texas is acting as a proprietor and not a regulator; and (2) [] Texas's lawsuit does not seek to control federal employees but, at most, only incidentally affects their duties." *Id.* The Fifth Circuit held Texas was entitled to a preliminary injunction to stop the actions of the United States Border Patrol. *Id.* at 192. Importantly, the court held that "[t]he injunction [was] not barred by intergovernmental immunity because Texas is seeking, not to 'regulate' Border Patrol, but only to safeguard its own property." *Id.*

The Fifth Circuit stated the United States is not immune from lawsuits requesting an injunction, even if the claims are based on common law rather than a federal cause of action. *See id.* at 200 (noting the statute does not require the cause of action to be federal in nature). Moreover, that intergovernmental immunity did not apply to Texas's actions.

Unfortunately for the Irrigation District, this case is distinguishable.

The United States has yet to argue that it cannot be sued for injunctive relief regarding a claim of trespass. To be sure, the United States argues that "Texas trespass laws cannot prevent the United States from constructing border wall on land it does not own." (Dkt. No. 9 at 3). Thus,

the United States is not saying it is immune from a common law trespass suit through sovereign immunity, but rather, even if the United States is trespassing, it has authority to do so under the Fifth Amendment takings clause for a public purpose. On this point, the United States has the better of the argument under *United States v. Bennett*, 145 F.4th 618 (5th Cir. 2025).

The United States relies on *Bennett* for the proposition "that Texas trespass law cannot prevent the United States from constructing border wall on land it does not own." (Dkt. No. 9 at 3). In *Bennett*, the district court addressed what valuation, if any, should be given to a structure built on a property after a taking occurred. The United States owned an easement on Ms. Bennett's property to build a section of the border wall. *Bennett*, 145 F.4th at 620. The United States initiated a condemnation proceeding to take said portion of the land to construct and improve the wall. *Id.* Ms. Bennett argued that she owned the wall on the land because the United States exceeded the scope of its easement. *Id.* The district court, however, concluded she was not entitled to the value of the wall. *Id.* Ms. Bennett relied on Supreme Court authority for the proposition that any improvements or fixtures built by a trespasser become part of the estate. *Id.* The Fifth Circuit, however, upon review, concluded that the trespass rule stated above does not limit or subvert the United States's authority under its eminent domain powers. *Id.*

In greater detail, the United States first constructed the wall in 2008, to which Ms. Bennett did not object. *Id.* at 621. It then initiated this condemnation proceeding in 2020, again, to which Ms. Bennet did not object. *Id.* Bennett believed she was entitled to the value of the wall because, under the trespass rule, she owned it at the time of the 2020 taking. *Id.* at 622. The United States, on the other hand, argued the trespass rule cannot apply because it acted pursuant to its constitutional power of eminent domain. *Id.* at 623. The Fifth Circuit determined the United States was acting under its authority to acquire the property, and thus, a state law restriction

on such would be an unconstitutional limitation on federal eminent domain powers. *Id.* The Fifth Circuit distinguished cases that address trespass law, but not the government's power of eminent domain in reviewing the issue. *Id.*

Of importance for this discussion, the Fifth Circuit stated that "State law cannot, however, limit the federal government's power of eminent domain or 'prescribe the manner in which it must be exercised.'" *Bennett*, 145 F.4th at 622 (quoting *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 494–95 (2021)). And it is on this point, the United States believes it can enter in the property of the Irrigation District, construct the border wall, and not worry about any compensation to the property owner until the Irrigation District either files a remedy under 28 U.S.C. § 2409 or file suit under the Tucker Act, 28 U.S.C. § 1491, with the Court of Federal Claims in Washington, D.C. (Dkt. No. 9 at 4–5).

The Irrigation District also relies on 42 U.S.C. § 4651, but on this too, the Irrigation District will most likely not succeed. Section 4651 "establishes certain uniform nationwide 'guidelines' for the public taking of any lands by agencies of the federal government." *United States v. 320.0 Acres of Land*, 605 F.2d 762, 822 (5th Cir. 1979).

The purpose is:

> [T]o encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by [these] [] policies.

42 U.S.C. § 4651.

While inverse condemnation is disfavored through § 4651, it does not expressly "create[] [] rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation." *Benderson Dev. Co. v. U.S. Postal Serv.*, 998 F.2d 959, 963 (Fed. Cir. 1993)

(quoting 42 U.S.C. § 4602(a)). This result is because 42 U.S.C. § 4651 "is a statement of policy, not law." *United States v. 3.17 Acres of Land*, 2012 WL 1327804, at *13 (E.D. La. Apr. 16, 2012).

While the guidelines set forth in 42 U.S.C. § 4651 are carefully crafted to expedite takings and avoid litigation, the issue is that they are *guidelines*. The United States can take property through other avenues with its eminent domain powers and suffer no recourse under 42 U.S.C. § 4651. Indeed, it does not designate rights, nor create liabilities upon the government for failure to comply. *See* 42 U.S.C. § 4602(a).

In summary, the Irrigation District's reliance on both *Texas v. United States* and 42 U.S.C. § 4651 is misplaced and the United States appears to have the better argument to support the taking as to these citations.

ii. Eminent Domain and the 5th Amendment

As noted, it is under eminent domain that the United States believes it holds the trump card in these proceedings. So much so, they did not present any evidence at the hearing and waited until their last reply to even cite the appropriate congressional authorization for the border wall.

Under the power of eminent domain, the United States employs three different statutory methods for acquiring land, as well as outright physical entry. *Kirby Forest Indus. v. United States*, 467 U.S. 1, 3 (1984). The first is a straight condemnation procedure as set forth in 40 U.S.C. § 257. *Id.* Under this method, an officer of the government will make an application with the attorney general who then initiates condemnation proceedings. *Id.* This method is governed by Federal Rule of Civil Procedure 71A. *Id.* at 4. The second method is faster, and the procedures are enumerated in 40 U.S.C. § 258a. *Id.* It allows the government "to file 'a declaration of taking signed by the authority empowered by law to acquire the lands [in question], declaring that said lands are thereby taken for the use of the United States,'" before a judgement is obtained. *Id.*

(quoting 40 U.S.C. § 258a (modification in original)). The third statutory method is a legislative taking, which Congress enacts a statute appropriating the land directly. *Id.* at 5. Lastly, "the United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner." *Id.*

Eminent domain can be exercised "simply by taking possession up front, with compensation to follow." *PennEast Pipeline Co.*, 594 U.S. at 487. This power has been used "against both private property and property owned by the States." *Id.* at 488. Nonconsenting states surrender immunity from the federal government's exercise of eminent domain power. *Id.* "[F]ederal eminent domain extend[s] to property within state boundaries as well." *Id.* at 494 (citing *Kohl v. United States*, 91 U.S. 367, 371 (1876)). This power extends to state-owned land. *Id.* at 495 (citing *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534 (1941)); *see also Cherokee Nation v. S. Kan. Ry.*, 135 U.S. 641, 656 (1890) (explaining that eminent domain "is essential to the independent existence and perpetuity of the United States, and is not dependent upon the consent of the states" (citations omitted)). Eminent domain power has also been delegated to private parties for public works. *PennEast Pipeline Co.*, 594 U.S. at 495. Accordingly, the "States consented to the federal eminent domain power, whether that power is exercised by the Government or its delegates." *Id.* at 505.

Pursuant to the Fifth Amendment: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. However, the United States does not have to provide said compensation prior to the taking. *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019). "So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities." *Id.* at 185. An inverse condemnation proceeding allows the plaintiff to recover property taken by the government. *Id.* at 186 (citing

*United States v. Clarke*, 445 U.S. 253, 257 (1980)). By contrast, direct condemnation occurs when the "government initiates proceedings to acquire title under its eminent domain authority." *Id.* The act of the taking triggers the claim for compensation. *Id.* at 190 (citing *United States v. Dow*, 357 U.S. 17, 22 (1958)). "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign to the taking." *Id.* at 195 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (modification in original)). "[A]n individual claiming that the United States has taken his property can seek just compensation under the Tucker Act . . . "[15] *Ruckelshaus*, 467 U.S. at 1016. "[B]ecause the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable." *Knick*, 588 U.S. at 201. Importantly, "[g]iven the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate." *Id.* at 202; *see also Hurly v. Kincaid*, 285 U.S. 95, 104 (1932).

In support of this current taking, the United States cites to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) for its authority to construct the border and The One Big Beautiful Bill (OBB) passed last year. (Dkt. No. 18 at 2).

The IIRIRA sets out the procedures for land acquisition regarding construction of the border wall. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),

[15] The Tucker Act is codified at 28 U.S.C. § 1491 and provides the United States Court of Federal Claims with jurisdiction to hear claims against the United States regardless of monetary amount involved. 28 U.S.C. § 1491(a)(1); *see also United States v. Bormes*, 568 U.S. 6, 10 n.2 (2012). "The Little Tucker Act, 28 U.S.C. § 1346(a)(2), provides that 'the district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of any civil action or claim against the United States, not exceeding $10,000 in amount, founded upon any Act of Congress." *Bormes*, 568 U.S. at 7 (citation modified).

Pub. L. No. 104-208, § 102, 110 Stat. 3009, 3009-555 (codified as amended at 8 U.S.C. § 1103(b)).[16]

Relevant here, it "gives the Attorney General the authority to purchase or bring condemnation actions to acquire lands in the vicinity of the United States-Mexico border."[17]

---

[16] As set out pursuant to the Act:

> (b) Land acquisition authority
>
> (1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.
> (2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.
> (3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of Title 40.
> (4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

8 U.S.C. § 1103.

[17] Congress has expressly authorized funding for border wall construction pursuant to the One Big Beautiful Bill. One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, 357-58 (2025). Notably, the One Big Beautiful Bill does not supplant or replace the procedures set out in 8 U.S.C. § 1103(b)(3):

> TITLE IX—COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS
> Subtitle A—Homeland Security Provisions
>
> SEC. 90001. BORDER INFRASTRUCTURE AND WALL SYSTEM.
>
> In addition to amounts otherwise available, there is appropriated to the Commissioner of U.S. Customs and Border Protection for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2029, $46,550,000,000 for necessary expenses relating to the following elements of the border infrastructure and wall system:
>
> (1) Construction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers.
> (2) Access roads.
> (3) Barrier system attributes, including cameras, lights, sensors, and other detection technology.

*United States v. 1.04 Acres*, 538 F. Supp. 2d 995, 1003 (S.D. Tex. 2008) (citing 8 U.S.C. § 1103). The Attorney General has the authority to acquire these lands "to control and guard the boundaries and borders of the United States . . . ." 8 U.S.C. § 1103(b)(1). It authorizes condemnation procedures pursuant to section 3113 of title 40 if the Federal Government and the property owner are unable to agree upon a reasonable price in connection with the taking of such property. 8 U.S.C. § 1103(b). While 40 U.S.C. § 3113 does not, by itself, create condemnation procedures, the IIRIRA does. *See 1.04 Acres*, 538 F. Supp. 2d at 1001–02.

The court in *1.04 Acres* addressed the issue before the court today: whether the United States has followed the requisite statutory procedure in a condemnation action. *Id.* at 1000. The plaintiff argued that negotiation pursuant to the IIRIRA is mandatory prior to condemnation proceedings. *Id.* at 1008. The court determined the specific language stating "unable to agree upon a reasonable price" creates a condition precedent requiring the two parties to negotiate before pursuing eminent domain remedies. *Id.* at 1009–10 (citing 8 U.S.C. § 1103(b)(3)). Therefore, an "attempt to reach an agreement is not discretionary, but rather it is an action that must precede an acquisition by the Government." *Id.* at 1010. The court ultimately concluded that "Congress clearly intended there to be some level of negotiation between the Government and the owner of a property interest prior to the institution of eminent domain procedures pursuant to 8 U.S.C. § 1103(b)(3)." *Id.*

The court also addressed the addition of the consultation provision in 2007. *Id.* at 1004. Congress addressed eminent domain in the consultation and savings provision of the act. *Id.* (citing

---

> (4) Any work necessary to prepare the ground at or near the border to allow U.S. Customs and Border Protection to conduct its operations, including the construction and maintenance of the barrier system.

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, 357-58 (2025).

Consolidated Appropriations Act, 2008. Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090–91 (2007)).

This statute sets out the following:

> (C) CONSULTATION.—
> (i) IN GENERAL.—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.
> (ii) SAVINGS PROVISION.—Nothing in this subparagraph may be construed to—(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or (II) affect the eminent domain laws of the United States or of any State.

Consolidated Appropriations Act, 2008. Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090–91 (2007).

The court acknowledged that the savings provision does not restrict the *ability* to proceed in condemnation proceedings, but still maintained the proper procedure is required. *Id.* at 1013. Essentially, the government can acquire land pursuant to its eminent domain powers. However, if pursuing land on the United States-Mexican border, negotiations shall be conducted prior to the taking pursuant to the noted legislation.[18] "Given the mandatory language of the consultation clause, that 'the Secretary of Homeland Security *shall* consult . . . ' this Court may find it proper to require compliance with the consultation clause, when appropriate, as condition prior to entry onto the property after the taking has been completed." *1.04 Acres*, 538 F. Supp. 2d at 1014

[18] Considering the power of eminent domain, it is interesting to note that Congress has set out similar type of procedures in regard to land acquisition by the United States in previous legislation. *See, e.g., Cherokee Nation v. S. Kan. Ry.*, 135 U.S. 641, 642–49, 659,10 S.Ct. 965, 966, 971–72 (1890) (setting out within the synopsis of the opinion the congressionally approved procedures from July 4, 1884, for the acquisition of land for the development of railway by the Southern Kansas Railway Company through Indian Territory; the adequacy of those procedures is addressed within the opinion.).

(emphasis in original) (citing 8 U.S.C. § 1103 note (Section 102(b)(1)(C)); *United States v. 162.20 Acres of* Land, 639 F.2d 299, 304–05 (5th Cir. 1981)).

iii. *Who will most likely win?*

Here, it is undisputed that negotiations never occurred, let alone a good faith attempt. In fact, prior to construction, no one with Spencer or the United States ever reached out to the Irrigation District to inform it about plans regarding the border wall. The only evidence presented demonstrates that the Irrigation District owns the land. Therefore, while eminent domain may eventually rule the day,[19] congressional authorization requiring consultation with property owners cannot be ignored. Based on citations of authority from the United States to justify this taking and evidence presented at the hearing, the undersigned submits this factor tips in favor of the Irrigation District.

**b. Irreparable Harm**

"Plaintiffs must show they are '*likely* to suffer irreparable harm in the absence of preliminary relief.'" *Gen. Land Off. of Tex.*, 722 F. Supp. 3d at 743 (quoting *Winter*, 555 U.S. at 20). A harm is considered "irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600 (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981)). Simply because economic damages are available does not render injunctive relief unavailable. *Id.* Most importantly, if a court determines "that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute . . . ." *Id.* (citing *Productos Carnic, S.A.*, 621 F.2d at 686–87).

[19] *See also 1.04 Acres*, 538 F. Supp. 2d at 1014 ("[T]he consultation clause as drafted by Congress is not a defense to the Government's acquisition of a property interest.").

In analyzing this factor, the only evidence presented is that border wall construction may harm the canal and maintenance of said canal. The Irrigation District has established the harm is irreparable because any damage or interference with the canal can interfere with public water management operations and disrupt the water service to its customers. Again, the Irrigation District serves many customers, including farmers, other agriculture based customers, and is the sole source of water for three cities including Pharr, San Juan, and Alamo. It also supplies water to a water corporation and parts of McAllen and Edinburg. This large customer list obviously poses a clear threat of injury should the construction choke the flow of water; an injury that cannot be completely remedied by monetary compensation. There are many customers relying on the Irrigation District to supply them with water. Furthermore, based on the facts presented, there is no indication that the United States will suffer irreparable harm, or that the United States' continued construction will not pose a threat of irreparable harm to the Irrigation District.

In fact, the Government's only claim of injury is that "there is no more basis for delay." (Dkt. No. 18 at 4). On this point, there is no question that border enforcement is of vital importance to the nation and this administration is rightly commended for their success in enforcing the laws.[20] But, there were just arguments in motions without any evidence or testimony presented at the hearing. The United States did note the alternative avenues for compensation resulting from the condemnation proceedings.[21] (Dkt. No. 9 at 5). It did not, however, address the evidence presented by the Irrigation District into the potential irreparable harm to the canal and the customers who rely on said canal.

---

[20] *See infra* Section II(c) and note 22.

[21] Just to reiterate, the undersigned is not saying the United States cannot condemn the land, but rather, it needs to follow the proper procedures when facilitating the land's acquisition as established by Congress.

The Court acknowledges that money can fix the canal itself, but it cannot go back in time and deliver water to those who could not receive it because of disruptions and clogging caused by border wall construction. At this point, it appears it is necessary to maintain the status quo. *See Janvey*, 647 F.3d at 600.

The Irrigation District will likely suffer irreparable harm in the absence of the injunction.

**c. Balancing of Equities and Interest of the Public**

"[C]ourts often consider the balance-of-equities and public-interest elements together, as they overlap considerably." *Gen. Land Off. of Tex.*, 722 F. Supp. 3d at 744 (collecting cases). When the government is the nonmovant, the two elements merge together. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Generally, the court must balance the claims of injury on each party. *Id.* (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). Courts should pay attention to the public consequences when issuing injunctive relief. *Pablo v. Venturella*, EP-25-CV-00566-DCG, 2026 WL 2078922, at *6 (W.D. Tex. July 17, 2026) (citing *Winter*, 555 U.S. at 24). The public interest is strongly served when enforcing immigration laws. *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976)). However, "the public is [also] served when the law is followed." *Daniels Health Scis., LLC*, 710 F.3d at 585.

When balancing the equities, the issue of injury is best described as a draw. Border enforcement is vital for survival of this country or for that fact, any nation. Similarly, land and water management is vital to the survival of local communities. In fact, both may be considered proper and necessary roles of a limited government in a constitutional republic. Notably, just outside sixty feet from the canal's centerline is previously built border wall. This appears to be where the federal government had honored the ownership of the Irrigation District while setting

up an enforcement mechanism to control entrance of illegal aliens into the country. This demonstrates that both governmental entities have, at least in the past, respected each other's role in benefiting the community at large.

An injunction at this point will not disservice public interest. The Irrigation District, again, plays a vital role in the local communities. And, all things considered, the undersigned, like any other state or federal court along the Texas-Mexico border can most likely take judicial notice of the importance of border enforcement. However, temporary injunctive relief will not disservice the public, because illegal immigration is not the imminent threat it once was due to the leadership of the President of the United States. *See President Trump Delivers for Texas: Lower Taxes, Border Security, and Jobs Coming Home*, THE WHITE HOUSE (Aug. 27, 2026), https://www.whitehouse.gov/releases/2026/08/president-trump-delivers-for-texas-lower-taxes-border-security-and-jobs-coming-home/ (last visited Sept. 2, 2026) (noting that this is the most secure border in a generation and "border apprehensions in July were 94% lower than the monthly average under Biden").[22]

[22] The undersigned does not understate the importance of border security; however, when issuing *temporary* relief, there appears to be less urgency than the United States argues within their petitions. *See Trump Administration Delivers 14 Straight Months of Zero Releases at the Border*, U.S CUSTOMS & BORDER PROT. (July 17, 2026), https://www.cbp.gov/newsroom/national-media-release/trump-administration-delivers-14-straight-months-zero-releases (last visited Sept 3, 2026) (noting an "unprecedented trend of historically low border crossings"); *see also* Stephen Dinan, *Trump Cuts Migrant Population by Nearly 3 Million; Total U.S. Population Likely to Drop*, THE WASH. TIMES (Sept. 3, 2026), https://www.washingtontimes.com/news/2026/sep/3/donald-trump-cuts-migrant-population-nearly-3-million-total-us/?cx_testId=68&cx_testVariant=cx_1&cx_artPos=3&cx_experienceId=EXKKVTPIWGKC&cx_experienceActionId=showRecommendationsXKS1PFNS84RP72#cxrecs_s (attributing the drop of illegal and legal immigration population to President Trump's stricter immigration policy and, also noting that this "change is all the more *striking* after the four years under President Biden, when the country added some 8.3 million immigrants to its population, the largest surge in history") (emphasis added).

In summary, the undersigned recognizes the important public interest of enforcing immigration protections. *See Gen. Land Off. of Tex.*, 722 F. Supp. 3d at 723 (highlighting the effectiveness of the border wall).[23] It also recognizes the importance of the local water district and, as related, the following the congressionally authorized procedures which appear to take into consideration the interests of the affected property owners. Both are of equal importance.

At this point, after review of the four factors and of significance, reviewing the congressionally approved procedures for acquisition of land for the border wall cited by the United States, the Irrigation District has a likelihood of success on the merits and irreparable harm in the absence of an injunction.

**III. Intervention**

There is a procedural point brought to the attention of the undersigned by Counsel for the Irrigation District. The Irrigation District first argues that the United States never entered this proceeding through the following procedures during the injunction hearing. (Injunction Hr'g Tr. 12:29:02–12:29:36 AM). The United States, on the other hand, argues it entered this proceeding simply upon removing the lawsuit to federal court. (Dkt. No. 18 at 1–2). For the reasons discussed below, the undersigned believes the United States did not properly enter this proceeding. However, because of the time sensitive nature and importance of this matter, rather than dismissal, the appropriate remedy is to recommend that the United States be provided time to properly intervene upon appropriate motion.

Intervention is governed by Federal Rule of Civil Procedure Rule 24. Like joinder, intervention can be permissive, or as of right.

---

[23] In fact, the Department of Homeland Security explains and emphasizes that the border wall is effective because it operates as a funnel. *Gen. Land Off. of Tex.*, 722 F. Supp. 3d at 726. Essentially, it forces illegal aliens into areas where border patrol is better able to seize them. *Id.* Thus, more walls mean fewer points of entry. *Id.*

> *On timely motion*, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent the interests.

Fed. R. Civ. P. 24(a) (emphasis added); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 436 (2017). Essentially, it must be timely, and the party must have an interest in the action. *Odia v. Jaguar Land Rover N. Am., LLC*, No. 4:24-CV-467, 2026 WL 608309, at *4 (S.D. Tex. Mar. 4, 2026) (citing *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 542 (5th Cir. 2022)). While the movant generally bears the burden, the court should generally allow intervention to attain justice. *Damon J. Baldone, LLC v. Starr Surplus Lines Ins.*, No. 24-543, 2024 WL2784852, at *4 (E.D. La. May 30, 2024) (citing *Adam Joseph Res. v. CAN Metals Ltd.*, 919 F.3d 856, 865 (5th Cir. 2019)). Courts will consider the proximity to the scheduling order and date of trial on the issue of timeliness. *See id.* at *5. However, this is an issue that is reserved to the discretion of the court. *McDonald v. E. J. Lavino Co.*, 430 F.3d 1065, 1071 (5th Cir. 1970) (collecting cases). Generally, a motion is timely if it does not "(1) prejudice the rights of the existing parties to the litigation or (2) substantially interfere with the orderly processes of the court." *Id.* at 1072. The most important consideration of timeliness, however, "is whether any existing party to the litigation will be harmed or prejudiced by the proposed intervenor's delay in moving to intervene." *Id.* at 1073 (citing *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1125 (5th Cir. 1970)). "In fact, [it] may well be the *only* significant consideration when the proposed intervenor seeks intervention of right." *Id.* (emphasis in original).

The United States argues that it properly intervened when it removed the case to federal court. (Dkt. No. 18 at 1). In fact, "[i]t became a proper party at the time it removed this case and explained why in the removal." (*Id.*). The issue, however, is that the United States never filed a

proper motion to intervene in this action per Fed. R. Civ. P. 24(a)(2). The United States is correct in noting that it explained its rationale for removal. However, the only explanation offered is that "the named Defendants are contractors acting on behalf of an agency of the United States." (Dkt. No. 1 at 2). This explanation is insufficient to constitute a "timely motion" as required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 24(b)(2), (c).

The United States already analyzed the four factors required for a motion to intervene in its Reply in Support of Defendant's Motion. (Dkt. No. 18 at 1–2). The analysis belongs in a proper motion pursuant to the Federal Rules of Civil Procedure. Notably, from everything presented, it does not appear that anything would preclude intervention. There is no prejudice to the parties, because, by all accounts, every party in this lawsuit has operated under the assumption that the United States is a party. Nonetheless, no citation or authority has been presented why such motion in compliance with rules of civil procedure is not required from United States.

**IV. Bond**

The plaintiff must provide a security bond once the application for a preliminary injunction is granted. *Laredo Rd. Co. v. Maverick County*, 389 F. Supp. 2d 729, 748 (W.D. Tex. 2005). The purpose is to allow "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." *Id.* (quoting Fed. R. Civ. P. 65(c)). The amount of security required is discretionary, and the trial court "may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curiam); *see Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (noting a court can decide to require no security at all). Most courts, however, will issue an injunction without bond only by showing that the other party will not suffer harm. *See Texans for Free Enter. v. Tex. Ethics Comm'n*, No. A-12-CA-0845-LY, 2012 WL 12874899, at *7 (W.D. Tex. Dec. 6, 2012)

("[T]here is no evidence that the state will suffer from harm from [the] court's injunction."), *aff'd*, 732 F.3d 535 (5th Cir. 2013); *Watkins v. City of Arlington*, No. 4:14-CV-381-O, 2014 WL 3408040, at *44 (N.D. Tex. July 14, 2014) (refraining to require a bond because the court does not believe the city will suffer significant monetary damages). *But see Erkan v. Warden, Hou. Cont. Det. Facility*, No. H-26-2599, 2026 WL 1459724, at *7 (S.D. Tex. May 22, 2026) (deciding against a security bond based on the court's discretion alone).

As noted, outside of the testimony of contractor, no evidence was presented to justify the request for losses of $50,000 a day. In fact, it was no more than a rough estimate and no accounting, spreadsheets, nor documentation was provided by either Spencer or the United States to justify the noted losses. Furthermore, Spencer presented no clear testimony that Spencer would continue to lose money after August 18, 2026, since it appears the company has continued to work on other parts of the border wall since that date. Moreover, there is conflicting evidence regarding what work, if any, the employees were performing, and whether they can be used on other locations of border wall construction that Spencer is currently under contract to build. Without an accurate estimate of such previous or future costs, the undersigned is left to speculate on actual damages and whether Spencer mitigated said damages. Thus, the undersigned cannot properly evaluate the gravity of the harm Spencer could suffer with the issuance of the injunction. In the absence of corroborative evidence, it is recommended that the security bond be set at a nominal amount of $1,000.00 payable to the Clerk of the Court.

## Conclusion

### *Recommended Disposition*

After proper presentation and review of the issues,[24] eminent domain may rule the day for the United States but at this point, placing a pause on the proceedings will not be a disservice to either party. A review of the four factors favors a finding for the Irrigation District.

Therefore, it is respectfully recommended that preliminary injunction requested by the Irrigation District (Dkt. No. 3) be **GRANTED** pending the result of this litigation.

It is further recommended that the United States be provided twenty-one (21) days to properly intervene in these proceedings as required by the Federal Rules of Civil Procedure.

It is further recommended that a nominal bond be set at $1,000, to be paid to the Clerk of the Court by the Irrigation District.

Finally, it is further recommended that there is good cause to extend the TRO entered by the 476th District Court of Hidalgo County, Texas on July 30, 2026, and that said TRO remain in force according to its term and is extended, without enlargement of its substantive restraints through October 15, 2026, to allow the parties time to file all necessary responses and objections for appropriate consideration by the District Court. *See Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2023 WL 5610293, at *12–13 (N.D. Tex. Aug. 30, 2023) (noting that "[t]he wording of Rule 65 does not foreclose the Court extending the TRO prior to receiving a subsequent renewal request from the party seeking the TRO." (citations omitted)).

---

[24] While the motion to dismiss (Dkt. No. 9) has been reviewed in consideration of the arguments presented for the preliminary injunction by the United States that motion remains pending before the assigned District Court for consideration and review.

***Notice to the Parties***

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). The district judge to whom this case is assigned shall make a *de novo* determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days after service shall bar an aggrieved party from *de novo* review by the District Court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of plain error or manifest injustice.

The Clerk shall also provide a copy of this Order to Counsel for all parties.

**DONE** at McAllen, Texas, this the 10th day of September 2026.

Juan F. Alanis
United States Magistrate Judge